# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

_____

THE UNITED STATES OF AMERICA,   )
                                )
             Plaintiff,         )     CIVIL ACTION NO.:
                                )
                                )     07-cv-3261-JES-BGC
v.                              )
                                )
THE STATE OF ILLINOIS,          )
                                )
             Defendant.         )
_____)

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT

OF COUNSEL:

GUS P. COLDEBELLA
*General Counsel (Acting)*

NICHOLAS D. GRAY
*Attorney-Advisor*
*Office of the General Counsel*

U.S. Department of Homeland Security
Mail Stop 3650
Washington, D.C.  20528

PETER D. KEISLER
Assistant Attorney General

RODGER A. HEATON
United States Attorney

ARTHUR R. GOLDBERG
Assistant Director, Federal Programs Branch

ALEXANDER K. HAAS (CA Bar# 220932)
Attorney for Plaintiff
Trial Attorney, Federal Programs Branch
United States Department of Justice
P.O. Box 883
Washington, D.C.  20044
Tel: (202) 307-3937—Fax: (202) 616-8470
alexander.haas@usdoj.gov

**<u>INTRODUCTION</u>**

This case presents a textbook example of conflict preemption.  At issue is a congressionally-authorized federal employment verification system administered by the Department of Homeland Security—the Basic Pilot Program—that enables employers to verify that newly-hired employees are eligible to work in the United States.  Created more than a decade ago, the Basic Pilot Program has been in continuous operation and available to all Illinois employers since its inception.  This is so because Congress mandated that it originally operate in five states with the highest populations of aliens not lawfully present in the United States, one of which is Illinois.  In 2003, Congress expanded the system so that all employers in the United States now have access to the Basic Pilot Program.  Congress thus created a voluntary federal program and mandated that it be available to all employers in the United States.

Yet in August 2007, Illinois enacted a statute that, unless certain conditions obtain, "prohibit[s]" Illinois employers "from enrolling in any Employment Eligibility Verification System, including the Basic Pilot Program," *see* Illinois Pub. Act 95-138, § 12(a)—the very same program which federal law created and to which all employers in the United States have access. The Illinois law precludes enrollment unless the Federal Government complies with standards— established by the State of Illinois—that are neither required by federal law nor consistent with the Program's implementation.  By effectively outlawing access to a tool that Congress made available to all employers in order to verify the employment eligibility of new employees, the Illinois Act conflicts with federal law and stands as an obstacle to the accomplishment and execution of the full intent and objectives of Congress.  The Illinois statute is thus preempted under the Supremacy Clause of the United States Constitution.  This Court should grant the United States' motion for summary judgment, declare the disputed provision of the Illinois

1

statute invalid, and permanently enjoin the State of Illinois from enforcing the offending statute.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      The U.S. Department of Homeland Security ("DHS") is charged with the enforcement of federal immigration laws.  This authority was transferred from the Immigration and Naturalization Service ("INS"), which has since been abolished.  *See* 6 U.S.C. §§ 251-298.

2.      Among the laws with which DHS is charged to enforce are statutes and related regulations governing the circumstances in which non-U.S. citizens may be employed within the United States.  It is a violation of federal law for employers to knowingly employ an alien who is not authorized to work in the United States.  *See* 8 U.S.C. § 1324a.

3.      Employers in the United States generally are required to verify the employment eligibility of all newly-hired employees by examining documentation presented by the employee and completing an employment eligibility verification form, known as the Form I-9.  *See* 8 U.S.C. § 1324a; 8 C.F.R. Part 274a.

4.      In 1996, Congress authorized the creation of a pilot program to enable employers to electronically confirm the employment eligibility of newly-hired employees, originally through a toll-free telephone line or other toll-free electronic media.  *See* Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") §§ 401-405, Pub. L. 104-208, Div. C, Title IV, Subtitle A, 110 Stat. 3009-655 through 3009-666, codified as a note to 8 U.S.C. § 1324a.  This program originally was referred to as the "Basic Pilot Program," and is now referred to as "E-Verify."

5.      Congress provided that employers may elect to participate in the Basic Pilot Program, except for specified entities of the U.S. Government and certain entities subject to an order under sections 274A(e)(4) and 274B(g) of the Immigration and Nationality Act ("INA"), whose participation was made mandatory.  *See* IIRIRA §§ 402(a), (e).

6.      Congress originally required that the Basic Pilot Program be available, at a minimum, in five of the seven states with the largest estimated populations of aliens not lawfully present in the United States, *see* IIRIRA § 401(c)(1), and Congress provided that the Basic Pilot Program would terminate four years after implementation.  *See* IIRIRA § 401(b).

7.      On September 15, 1997, the INS published in the Federal Register guidelines under which employers could elect to participate in the Basic Pilot Program.  The guidelines identified Illinois as being one of the five states with the largest estimated populations of aliens not lawfully present in the United States and, therefore, solicited employers in Illinois to participate in the Basic Pilot Program.  *See* Pilot Programs for Employment Eligibility Confirmation, 62 Fed. Reg. 48,309 (Sept. 15, 1997).

8.      In 2001, Congress extended its authorization of the Basic Pilot Program to six years from the date of its initial implementation.  *See* Basic Pilot Extension Act of 2001, Pub. L. 107-128, 115 Stat. 2407.

9.      In 2003, Congress again extended its authorization of the Basic Pilot Program to eleven years from the date of its initial implementation.  Congress also mandated that DHS expand the program to all fifty states as of December 1, 2004.  *See* Basic Pilot Program Extension and Expansion Act of 2003, Pub. L. 108-156, 117 Stat. 1944-46.

10.      On December 20, 2004, U.S. Citizenship and Immigration Services published a notice in the Federal Register announcing the expansion of the Basic Pilot Program to all fifty states and the introduction of an internet-based verification process.  *See* Expansion of the Basic Pilot Program to All 50 States and the District of Columbia; Providing Web-Based Access, 69 Fed. Reg. 75,997-03 (Dec. 20, 2004).

11.      The Basic Pilot Program operates by comparing identifying information submitted

3

by newly-hired employees against information contained in databases maintained by the Social

Security Administration ("SSA") and, where necessary, immigration records maintained by DHS,

to verify that an individual is authorized to work in the United States.  *See* Declaration of Gerri

Ratliff ("Ratliff Decl.") at ¶ 3, attached hereto as Exhibit A.

12.     Within three days of hiring a new employee, the employee's identifying

information is submitted to the Federal Government by the employer through an internet

connection.  If the system confirms that the employee is authorized to work in the United States,

the employer is notified of that electronically.  If the system is unable to verify the employee's

employment authorization, the employer is issued a "tentative nonconfirmation" notice ("TNC").

This initial verification can occur as quickly as a matter of seconds, or may require one or more

business days where a manual review of records is required.  *See* Ratliff Decl. at ¶¶ 3-4.

13.     Employers are required to notify the employee when the system issues a TNC, and

also provide the employee with instructions on how to pursue secondary verification.  An

employee may choose either to not contest the TNC, in which case the TNC is considered a final

nonconfirmation, or may contest the TNC by contacting the SSA or DHS within eight business

days.  *See* Ratliff Decl. at ¶ 5.

14.     Final confirmation or nonconfirmation of the employee's employment eligibility

usually is provided to employers within ten business days of when the employee originally was

referred for secondary verification.  *See* Ratliff Decl. at ¶ 5.

15.     Federal law precludes employers from terminating an employee because the Basic

Pilot system issued a TNC.  *See* IIRIRA § 403(a)(4)(B)(iii).  Only after a final non-confirmation

is issued for that employee may an employer terminate the employee.  *See id.* § 403(a)(4)(C)(i).

16.     On August 13, 2007, Rod R. Blagojevich, in his official capacity as Governor of

the State of Illinois, signed into law H.B. 1744. *See* Illinois Public Act 95-138 ("the Illinois

Act"). The Illinois Act will become effective on January 1, 2008.[1]

17.    The Illinois Act amends Illinois' Right to Privacy in the Workplace Act, 820 Ill.

Comp. Stat. 55/1 *et seq.*, by adding, in part, the following language:

> *Employers are prohibited from enrolling in any Employment Eligibility*
> *Verification System, including the Basic Pilot program*, as authorized by 8 U.S.C.
> § 1324a, Notes, Pilot Programs for Enforcement Eligibility Confirmation (enacted
> by PL 104-208, div. C, title IV, subtitle A), until the Social Security
> Administration (SSA) and Department of Homeland Security (DHS) databases are
> able to make a determination on 99% of the tentative nonconfirmation notices
> issued to employers within 3 days, unless otherwise required by federal law.

Illinois Pub. Act 95-138, § 12(a) (emphasis added); a copy of which is attached as Exhibit B.

18.    Federal law requires only that the Basic Pilot Program provide confirmation or

tentative nonconfirmation of an individual's employment eligibility within three business days of

the initial query. *See* IIRIRA § 404(b). Where a TNC is contested by the employee, the statute

grants the Federal Government ten business days after the TNC is issued to provide the employer

with a final confirmation or nonconfirmation. *See* IIRIRA § 404(c).

19.    Since 2004, the number of Illinois employers participating in the Program has

increased every year. As of November 1, 2007, over 900 Illinois employers had enrolled in the

Basic Pilot Program, representing over 2,800 different hiring sites. *See* Ratliff Decl. at ¶ 8.

20.    Since passage of the Illinois Act, DHS has received inquiries from Illinois

employers and personnel management companies inquiring as to the legality of participation in

the Basic Pilot Program after the Illinois Act becomes effective. *See* Ratliff Decl. at ¶ 9.

---

[1]  As set forth in the United States' motion, the United States has sought summary judgment in advance of the statute's effective date so that briefing on the merits will be complete before that date, which will, it is hoped, obviate the need to seek interim injunctive relief. The United States reserves the right to seek such relief should it become necessary.

**LEGAL STANDARD**

"Summary judgment is appropriate where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *King ex rel. King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 816 (7th Cir. 2007); *see also* Fed. R. Civ. P. 56(c). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1996) (emphases in original); *see also Butts v. Aurora Health Care*, 387 F.3d 921, 924 (7th Cir. 2004) ("The mere existence of an alleged factual dispute will not defeat a summary judgment motion; instead, the nonmovant must present definite, competent evidence in rebuttal."). The United States, as plaintiff, may seek summary judgment "at any time after the expiration of 20 days from the commencement of the action" "with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof." Fed. R. Civ. P. 56(a).

**ARGUMENT**

**THE ILLINOIS ACT IS PREEMPTED BECAUSE IT CONFLICTS WITH CONGRESS' PURPOSE IN CREATING THE BASIC PILOT PROGRAM AND ITS MANDATE THAT IT BE AVAILABLE TO EMPLOYERS IN ILLINOIS**

Federal law's preemptive power arises from the Supremacy Clause of the United States Constitution, which provides that the "Constitution and the Laws of the United States . . . shall be the supreme Law of the Land." U.S. Const., Art. VI, cl. 2; *Fidelity Federal Savings & Loan Ass'n. v. De La Cuesta*, 458 U.S. 141, 152 (1982). The Supreme Court has recognized three ways in which federal law may preempt, and thereby displace, state law under the Supremacy Clause. *See Hoagland v. Town of Clear Lake, Ind.*, 415 F.3d 693, 696-97 (7th Cir. 2005). First, in what is referred to as "express preemption," state laws or activities are preempted when there

6

is an explicit federal statutory command that they be displaced. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992). Second, "field preemption" occurs when federal law "so thoroughly occupies a legislative field 'as to make reasonable the inference that Congress left no room for the States to supplement it.'" *Cipollone v. Liggett Group*, 505 U.S. 504, 516 (1992). Third, under what is commonly called "conflict preemption," state law is displaced when it is impossible to comply with both state and federal law, or when state law "stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). "[C]onflict pre-emption is different in that it turns on the identification of 'actual conflict,' and not on an express statement of pre-emptive intent." *Geier v. Am. Honda Motor Corp.*, 529 U.S. 861, 884 (2000). Ultimately, given federal law's preemptive force, all contrary state law "must yield to the law of Congress." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 210 (1824).

The Illinois Act presents a classic case of conflict preemption because it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Frank Bros., Inc. v. Wisconsin Dep't of Transp.*, 409 F.3d 880, 894 (7th Cir. 2005) (internal quotations omitted). To determine whether state law conflicts with the purposes and objectives of Congress, "the crucial inquiry is whether state law differs from federal law in such a way that achievement of the congressional objective is frustrated." *Id.* (internal quotations omitted); *see also Indiana Bell Tel. Co. v. Indiana Util. Regulatory Comm'n*, 359 F.3d 493, 497 (7th Cir. 2004) ("Congressional intent is the ultimate touchstone of pre-emption analysis."). "Congress's intent may be explicit or it may be implicit in the statute's structure and purpose." *Id.* In *Geier*, the Supreme Court made crystal clear that all that is necessary to demonstrate congressional intent to preempt state law is the presence of an actual conflict between state and federal law.

7

*See Geier*, 529 U.S. at 884-85 ("one can assume that Congress . . . ordinarily would not intend to permit a significant conflict" between federal and state law).  Here, as both the statutory language and the legislative history show, Congress' objectives in establishing the Basic Pilot Program and making it available to employers in all states, including those in Illinois, are plainly frustrated by the Illinois Act, which effectively prohibits enrollment in the Basic Pilot Program.

Congress' intent in establishing the Basic Pilot Program was to provide employers with an automated tool for verifying the employment eligibility of newly-hired employees.  *See* H.R. Rep. 104-828, at 199 (1996) (stating purpose of bill is, *inter alia*, to "improv[e] the verification system for eligibility for employment"); *id.* at 236 ("The confirmation system shall be designed and operated to, among other things, maximize its reliability and ease of use . . . .").  It was expected that providing employers with a more efficient tool for verifying the employment eligibility of new hires would aid the enforcement of the employment prohibitions in the INA. *See* IIRIRA §§ 401-405 (included under Title IV, "Enforcement of Restrictions Against Employment"); *see also* H.R. Rep. 108-304(I), 108th Cong., 2003 WL 22321879.  In particular, Congress sought to create a system to permit employers to verify that the documents provided by prospective employees are, in fact, genuine.[2]  In 2001, Congress extended the authorization for the Program and, in 2003, Congress expanded the Basic Pilot Program to all fifty states, clearly demonstrating congressional intent that access to the Basic Pilot Program be available to all employers in the Nation.  *See* Pub. L. 108-156, § 3(a).  The House Report emphasizes that the 2003 extension and expansion "modifie[d] IIRIRA to *allow any employer* to ch[o]ose to

---

[2]  The House Report to the most recent extension of the Program emphasizes that the Program was created to cure deficiencies in earlier federal legislation caused by the easy availability of counterfeit documents that employers are required to accept.  *See* H.R. Rep. 108-304(I), 108th Cong., 1st Sess. 2003, 2003 WL 22321879, *3 (stating that Congress sought to "weed out fraudulent numbers and thus to ensure that new hires are genuinely eligible to work").

participate in the pilot program, regardless of what state it is located in." *See* H.R. Rep. 108-304(I), 108th Cong., 1st Sess. 2003, at 7, 2003 WL 22321879 (emphasis added). Indeed, Congress provided that all employers that wish to participate may do so when it stated that "any person or other entity that conducts any hiring (or recruitment or referral) in a State in which [the Basic Pilot Program] is operating may elect to participate in that . . . program."[3] IIRIRA § 402(a). Congress was thus explicit in its intent to provide Illinois employers with access to the Basic Pilot Program.[4]

The Illinois Act frustrates these objectives by stripping Illinois employers of their ability to use the Basic Pilot Program, interfering with the Federal Government's approach to enforcing federal immigration laws in a state with one of the largest populations of aliens not lawfully present in the United States. By its express terms, section 12 of the Illinois Act directly conflicts with Congress' decision to make the Basic Pilot Program available to Illinois employers insofar as it "prohibit[s]" employers from enrolling in "any Employment Eligibility Verification System, including the Basic Pilot Program" absent certain conditions not found in—and, indeed, contrary to—federal law. Specifically, employers may not enroll in the Basic Pilot Program unless the

---

[3] An employer's ability to participate in the Basic Pilot Program is not absolute. For example, employers may be prohibited from participating in the Program for failing to follow the terms and conditions set forth in the Memorandum of Understanding that governs their access to the Program. *See* U.S. Citizenship and Immigration Services, E-Verify Memorandum of Understanding (July 18, 2007), *available at* www.uscis.gov/files/nativedocuments/MOU.pdf (last visited Nov. 15, 2007) (stating that DHS may terminate the agreement where the employer fails to follow established procedures or legal requirements).

[4] Consistent with congressional intent in first authorizing the Program in 1996, Illinois employers have had the ability to participate in the Basic Pilot Program from its inception. Congress expressly intended that the Program "shall" be available to employers in five of the seven states with the largest estimated populations of aliens not lawfully present in the United States. *See* IIRIRA § 401(c)(1). And the former-INS identified Illinois as one of the states with the largest populations of aliens not lawfully present in the United States. *See* 62 Fed. Reg. 48,309 (Sept. 15, 1997).

Federal Government issues final confirmations and nonconfirmations within three days for 99%

of all individuals for whom a TNC is issued.  *See* Illinois Pub. Act 95-138, § 12(a).  Federal law,

however, provides the SSA and DHS ten business days to resolve TNCs, *see* IIRIRA § 404(c),

and, in practice, employers may not be notified of the results of the secondary verification

process until ten days after the TNC is issued.  *See* Ratliff Decl. at ¶¶ 4, 5.  Therefore, Illinois

employers are precluded from enrolling in the Basic Pilot Program under the Illinois Act.  An

employer violating this prohibition faces sanctions including fines, judgment for damages and

attorneys' fees, and may even be charged with a petty offense.  *See* 820 Ill. Comp. Stat. 55/15.

The Illinois Act therefore clearly conflicts with and is preempted by federal law.

      It does not matter for the preemption analysis that Congress' authorization for the Basic

Pilot Program does not require participation by Illinois employers.  It is axiomatic that a state

law, such as the Illinois Act, that proscribes and punishes an option expressly provided for by

Congress serves to frustrate the purpose of federal law.  In *Fidelity Federal Savings & Loan

Ass'n.*, for example, the Supreme Court held that a federal banking regulation that permitted

federally chartered savings and loans to exercise due-on-sale clauses in mortgages preempted

state laws prohibiting the use of such clauses.  458 U.S. at 154-55.  Notably, the Supreme Court

expressly rejected the argument that there can be no conflict between a federal law that permits,

but does not mandate, certain activity on the one hand, and a state law that proscribes that

activity on the other.  *Id.* ("The conflict does not evaporate because the Board's regulation simply

permits, but does not compel, federal savings and loans to include due-on-sale clauses . . . .").

Rather, state laws that "limit[] the availability of an option" that is specifically provided for

under federal law—such as access to a federal employment verification system—"create[] 'an

obstacle to the accomplishment and execution of the full purposes and objectives'" of Congress

and are preempted.  *See id.* at 156 (quoting *Hines*, 312 U.S. at 67).[5]  The Illinois Act does just

that:  It restricts access to a tool that Congress made available to employers in Illinois and across

the country generally.

Moreover, a state government's disagreement with the means chosen by Congress (*e.g.*,

providing access to an employment verification system) to achieve a certain end (*e.g.*, improved

enforcement of the INA employment prohibitions) does not enable a state to enact conflicting

laws.  *See Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 103 (1992) (plurality) ("A state

law . . . is pre-empted if it interferes with the methods by which the federal statute was designed

to reach [its] goal"); *see also Bell*, 359 F.3d at 497 (state law is "preempted where what the state

has done is an obstacle to the execution of Congress's purpose" or "interferes with the methods

Congress selected to achieve a federal goal . . . .").  Here, it is clear that Congress intended to

"allow any employer to chose to participate in the pilot program, regardless of what state it is

located in."  *See* H.R. Rep. 108-304(I), 108th Cong., 1st Sess. 2003, 2003 WL 22321879, *7.

Whatever objections or criticisms Illinois may have regarding the Basic Pilot Program, the state

does not have veto power over duly enacted federal laws.  Yet that is precisely what the Illinois

---

[5]  Illinois cannot avoid the preemptive effect of federal law by arguing that compliance
with both statutes is theoretically possible because IIRIRA only requires selected entities to
participate in the Basic Pilot Program and the enrollment prohibition in the Illinois Act applies
"unless otherwise required by federal law."  Illinois Pub. Act 95-138, § 12(a).  Although IIRIRA
only requires the participation of certain employers, Congress afforded *all* employers with the
option to participate in the Basic Pilot Program.  *See* IIRIRA § 402(a) (stating "any person or
other entity that conducts any hiring (or recruitment or referral) in a State in which a pilot
program is operating *may elect to participate* in that pilot program") (emphasis added).  By
effectively prohibiting Illinois employers from enrolling in the Basic Pilot Program, the state is
precluding employers from doing the very thing that Congress has explicitly stated employers
may do.  The Supremacy Clause prohibits such interference by states in the exercise of
federally-conferred rights.  *See Sperry v. Florida*, 373 U.S. 379, 385 (1963) (holding states may
not restrict federally-conferred right to practice patent law by enforcing state attorney licensing
requirements on nonlawyers).

Act attempts—*i.e.*, an effective prohibition on Illinois employers enrolling in the Basic Pilot

Program because of the state's apparent disagreement with the existence and/or operation of the

employment verification tool made available to employers by Congress. Accordingly, the Illinois

Act is preempted.

It is similarly irrelevant for this analysis that the Illinois Act is ostensibly directed at

Illinois employers rather than at the Federal Government. The Supreme Court has recognized

that laws attempting to indirectly regulate the Federal Government by imposing state standards

that must be satisfied over and above federal requirements are just as impermissible under the

Supremacy Clause as laws that attempt to directly regulate the Federal Government.[6] *See Leslie*

*Miller, Inc. v. Arkansas*, 352 U.S. 187, 189-90 (1956). In *Leslie Miller*, the Air Force had

awarded a base construction contract to a private firm, and the state then instituted proceedings

against the contractor for its failure to obtain a license under state law before executing the

contract. The Court rebuffed that regulatory intrusion, concluding that the state licensing

standards created "a virtual power of review over the federal determination of 'responsibility.'"

*Id.* at 190. The Court held that the state had no authority to regulate third-party Air Force

contractors because the application of state law would "frustrate the expressed federal policy."

*Id*. The State of Illinois thus cannot avoid the limitations of the Supremacy Clause merely by

contending that the Illinois Act is directed at employers in the state, and not the United States

directly. Indeed, where Supremacy Clause limitations are at issue, "the question [] is not *whom*

---

[6] It is plain that the Illinois Act is directed at the Federal Government because the timing requirements on which Illinois purports to condition participation by Illinois employers are not within the power of those Illinois employers to achieve. The Illinois Act seeks to preclude enrollment by Illinois employers unless the *Federal Government* issues final determinations within three days of a TNC being issued. Put simply, Illinois attempts to regulate the operations of the Basic Pilot Program itself, which is clearly subject to the Federal Government's control.

the [state] statute regulates, but rather, against *what activity* it regulates." *SPGGC, LLC v. Ayotte*, 488 F.3d 525, 532 (1st Cir. 2007) (emphasis in original).  The activity regulated by the Illinois Act is the ability of Illinois employers to participate in a federal program that Congress made available to employers in all states, including (indeed, especially) those in Illinois, a state with one of the five largest populations of aliens not lawfully present in the United States.

Importantly, Congress' authorization for the Basic Pilot Program in IIRIRA is not a statute establishing baseline federal standards on which the state may impose stricter standards. *See, e.g.*, *Frank Bros., Inc.*, 409 F.3d at 887-95 (discussing Federal Davis-Bacon Act merely set a floor for prevailing wages, to which states were free to augment upwards).  The only provision in IIRIRA regarding the timing of final determinations allows the Federal Government ten days after a TNC is issued.  *See* IIRIRA § 404(c).  Nothing in the text of the statute indicates that Congress intended to allow Illinois to impose a stricter three-day deadline as the Illinois Act seeks to do.  Were states free to impose conditions on federal programs, as Illinois has done here, states would be empowered to determine the means by which the Executive Branch implements the policy choices of Congress, effectively allowing the states to regulate the Federal Government.  Such an approach conflicts with the Supremacy Clause's provision that the Laws of the United States shall be the supreme law of the Land.  *See United States v. Georgia Pub. Serv. Comm'n*, 371 U.S. 285, 293 (1963) ("[A] State is without power by reason of the Supremacy Clause to provide the conditions on which the Federal Government will effectuate its policies"); *see also Augustine v. Dep't of Veterans Affairs*, 429 F.3d 1334, 1339 (Fed. Cir. 2005) ("It is long established that any state or local law which attempts to impede or control the federal government or its instrumentalities is deemed presumptively invalid under the Supremacy Clause.").  A contrary rule would turn the Supremacy Clause on its head and rob Congress of the

13

ability to implement voluntary federal programs to effectuate federal policy.

Moreover, the Illinois Act essentially conditions Illinois employers' access to the Basic Pilot Program on the federal system's ability to meet certain benchmarks set by the Illinois Act. *See* Illinois Act § 12(a) (prohibiting employer participation unless final determinations are made within 3 days of a TNC being issued). This is improper under the Supremacy Clause. It has been clear since at least *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819), that a state may not regulate the Federal Government or obstruct federal operations. As the Supreme Court made clear long ago, "[t]he states have no power . . . to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the power vested in the general government." *McCulloch*, 17 U.S. at 326-27. The "activities of the Federal Government are free from regulation by any state" except where Congress expressly provides to the contrary. *Hancock v. Train*, 426 U.S. 167, 178-79 (1976). And it is plain that such clear expression is absent here and also that Congress has *itself* set the time within with the federal system must process and respond as a result of a TNC. *See* IIRIRA § 404(c).

At bottom, because the Illinois Act directly conflicts with congressional authorization for the Basic Pilot Program and stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, it is preempted under the Supremacy Clause. *See Boomer*, 309 F.3d at 417. Where, as here, a state statute is preempted, the statute is invalid and cannot be enforced. *See Dalton v. Little Rock Family Planning Servs.*, 516 U.S. 474, 476 (1996); *Cannon v. Edgar*, 33 F.3d 880, 883 (7th Cir. 1994).

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant the United States' motion for summary judgment and declare that federal law preempts Section 12(a) of the Illinois Act and is invalid,

null, and void.  As a result, the Court should issue a permanent injunction against defendant

prohibiting enforcement of Section 12(a) of the Illinois Act, and grant such other and further

relief as may be just and proper.

Dated:  November 16, 2007                  Respectfully submitted,

 OF COUNSEL:                               PETER D. KEISLER
                                           Assistant Attorney General


 GUS P. COLDEBELLA                         RODGER A. HEATON
 *General Counsel (Acting)*                United States Attorney

 NICHOLAS D. GRAY                          ARTHUR R. GOLDBERG
 *Attorney-Advisor*                        Assistant Director, Federal Programs Branch
 *Office of the General Counsel*
                                                  */s/ Alexander K. Haas*
 U.S. Department of Homeland Security      ALEXANDER K. HAAS (CA Bar# 220932)
 Mail Stop 3650                            Attorney for Plaintiff
 Washington, D.C.  20528                   Trial Attorney, Federal Programs Branch
                                           United States Department of Justice
                                           P.O. Box 883
                                           Washington, D.C.  20044
                                           Tel: (202) 307-3937—Fax: (202) 616-8470
                                           alexander.haas@usdoj.gov

### Certificate of Service

I hereby certify that on November 16, 2007, I filed the foregoing Memorandum in Support of Summary Judgment and other materials in support of the United States' motion for summary judgment through the Court's CM/ECF system.

I further certify that on November 16, 2007, I have mailed by first-class mail through the United States Postal Service, the foregoing materials to the following non-registered participant:

Attorney General Lisa Madigan
Terence J. Corrigan
Assistant Attorney General
500 South Second Street
Springfield, IL 62706
Telephone: 217/782-5819
Facsimile: 217/524-5091
E-mail: tcorrigan@atg.state.il.us
Attorneys for Defendant, the State of Illinois

_/s/ Alexander K. Haas_
ALEXANDER K. HAAS (CA Bar# 220932)
Attorney for Plaintiff
Trial Attorney, Federal Programs Branch
United States Department of Justice
P.O. Box 883
Washington, D.C.  20044
Tel: (202) 307-3937—Fax: (202) 616-8470
alexander.haas@usdoj.gov

E-FILED
Friday, 16 November, 2007  04:08:29 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>v.<br><br>THE STATE OF ILLINOIS,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)   CIVIL ACTION NO.:<br>)   07-cv-3261-JES-BGC<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF GERRI RATLIFF

Pursuant to 28 U.S.C. § 1746, I, Gerri Ratliff, declare and state as follows:

1.     I am currently serving as the Deputy Associate Director of the National Security and Records Verification Directorate, which oversees the Verification Division within U.S. Citizenship and Immigration Services (USCIS) under the U.S. Department of Homeland Security (DHS).  Before joining this directorate on September 24, 2007, I served as the first Chief of the Verification Division from 2006 to 2007.  I have worked for U.S. Citizenship and Immigration Services and the former Immigration and Naturalization Service since 1998 and for the Federal Government with a focus on immigration policy since 1990.  I make this Declaration based on my personal knowledge and from information provided to me by personnel with relevant knowledge.

2.     E-Verify, formerly known as the Basic Pilot / Employment Eligibility Verification Program, is a free and simple internet-based system that electronically verifies whether a newly-hired employee is authorized to work in the United States.  The program was initially mandated by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996

(IIRIRA), and has been in existence since 1997. E-Verify is a partnership between DHS and the Social Security Administration (SSA), and it is administered by USCIS' Verification Division.

3.      E-Verify operates by allowing participating employers to electronically compare employee information provided on the Form I-9 (the paper-based employee eligibility verification form required for all new hires) against more than 425 million records in SSA's database and more than 60 million records in DHS' immigration databases to verify the employment eligibility of newly-hired employees. When an individual is hired by an employer participating in E-Verify, the new employee presents the employer with certain identification and work authorization documents—such as a passport, driver's license, birth certificate, and/or Social Security card. Within three days of hiring the employee, the employer examines the documents to determine whether they appear to be genuine, and, if so, transmits the information in the documents through a secure internet portal. This information is then automatically checked against records contained in databases maintained by SSA, and, where necessary, immigration records maintained by DHS.

4.      In approximately 92% of cases, employers are notified by the system within seconds that the employee is authorized to work in the United States. If DHS is unable to electronically confirm the work authorization of a non-U.S. citizen, a manual check of records is then performed by DHS. Results from these manual checks are communicated to the employer usually within one business day of the query being submitted to E-Verify. Verification of an employee's work eligibility is confirmed by such manual checks in approximately 1.4% of all queries to E-Verify. Where the system is unable to verify an individual's employment status, or where the USCIS manual check fails to confirm the status of a non-U.S. citizen, the employer is issued a "tentative nonconfirmation" notice (TNC). A TNC may be issued by the system in a

2

matter of seconds, such as where the citizenship status or Social Security number provided by the employee does not match those in the SSA database, or may be issued after the manual check performed by DHS. Regardless, in all cases employers receive some response from the system within seconds of querying E-Verify (e.g., work authorized, manual check needed, or TNC).

5.    An employer that is issued a TNC is required to inform the new employee of the result and provide the employee with instructions on how to pursue secondary verification. Where an employee chooses not to contest the TNC, it is considered a final nonconfirmation. An employee choosing to contest the TNC has eight business days to contact the SSA or DHS to resolve the TNC. Generally, results of this secondary verification are provided to the employer within ten business days of the date in which the employee was referred to the government for secondary verification. Results of the secondary verification process are either a confirmation that the employee is authorized to work in the United States or a final nonconfirmation.

6.    Employers enroll in E-Verify by accessing the program's registration website at https://www.vis-dhs.com/employerregistration and following the online instructions. As part of the registration process, the employer must review and accept a Memorandum of Understanding (MOU). The MOU sets forth the terms and conditions of participating in E-Verify, including the respective obligations of the SSA, USCIS, and the employer. The registration process also requires the employer to provide information such as company name, address, points of contact, Employer Identification Number, number of employees (range), North American Industry Code System (NAICS), and the number of employment sites. Once the registration is processed, the employer receives a confirmation email containing the company ID, user ID, temporary password, and instructions for accessing the E-Verify system for the first time. The employer is also required to complete an online tutorial and display E-Verification participation posters in

their workplace.  Upon completing these steps, the employer may begin using E-Verify to verify the employment eligibility of newly-hired employees.

7.     The number of employers participating in the E-Verify program has grown steadily throughout its operation.  As of November 2, 2007, 30,621 employers have signed up to use E-Verify, representing 124,384 separate hiring sites.  A total of 3,271,871 queries were made against the system in fiscal year 2007, which ended on September 30, 2007.  Roughly 800 employers join E-Verify each week.

8.     Since 2004, the number of Illinois employers participating in E-Verify has grown each year.  As of November 2, 2007, over 945 Illinois employers have joined E-Verify, representing 2,813 hiring sites.

9.     In recent months, various Illinois employers and personnel companies have contacted DHS inquiring about the legality of participating in E-Verify due to passage of the Illinois law.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.  Executed this 16th day of November, 2007, in Washington, D.C.

_Gerri Ratliff_
Gerri Ratliff

Westlaw.

820 ILCS 55/12                                                                      Page 1

West's Smith-Hurd Illinois Compiled Statutes Annotated Currentness
  Chapter 820. Employment
   Labor Relations
    Act 55. Right to Privacy in the Workplace Act (Refs & Annos)

  ➡ **55/12. Restrictions on use of Employment Eligibility Verification Systems**

          \<Text of section added effective January 1, 2008\>

§ 12. Restrictions on use of Employment Eligibility Verification Systems.

(a) Employers are prohibited from enrolling in any Employment Eligibility Verification System, including the **Basic Pilot program**, as authorized by 8 U.S.C. 1324a, Notes, Pilot Programs for Employment Eligibility Confirmation (enacted by PL 104-208, div. C, title IV, subtitle A), until the Social Security Administration (SSA) and Department of Homeland Security (DHS) databases are able to make a determination on 99% of the tentative nonconfirmation notices issued to employers within 3 days, unless otherwise required by federal law.

(b) Subject to subsection (a) of this Section, an employer who enrolls in the **Basic Pilot program** is prohibited from the Employment Eligibility Verification Systems, to confirm the employment authorization of new hires unless the employer attests, under penalty of perjury, on a form prescribed by the Department of Labor:

  (1) that the employer has received the Basic Pilot training materials from DHS, and that personnel who will administer the program have completed the Basic Pilot Computer Based Tutorial (CBT); and

  (2) that the employer has posted the notice from DHS indicating that the employer is enrolled in the **Basic Pilot program**, the anti-discrimination notice issued by the Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC), Civil Rights Division, U.S. Department of Justice, and the anti-discrimination notice issued by the Illinois Department of Human Rights (IDHR).

(c) Responsibilities of employer using Employment Eligibility Verification Systems.

  (1) The employer shall display the notices supplied by DHS, OSC, and IDHR in a prominent place that is clearly visible to prospective employees.

  (2) The employer shall require that all employer representatives performing employment verification queries complete the CBT. The employer shall attest, under penalty of perjury, on a form prescribed by the Department of Labor, that the employer representatives completed the CBT.

  (3) The employer shall become familiar with and comply with the Basic Pilot Manual.

  (4) The employer shall notify all prospective employees at the time of application that such employment verification system may be used for immigration enforcement purposes.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

(5) The employer shall provide all employees who receive a tentative nonconfirmation with a referral letter and contact information for what agency the employee must contact to resolve the discrepancy.

(6) The employer shall comply with the Illinois Human Rights Act and any applicable federal anti-discrimination laws.

(7) The employer shall use the information it receives from SSA or DHS only to confirm the employment eligibility of newly-hired employees after completion of the Form I-9. The employer shall safeguard this information, and means of access to it (such as passwords and other privacy protections), to ensure that it is not used for any other purpose and as necessary to protect its confidentiality, including ensuring that it is not disseminated to any person other than employees of the employer who need it to perform the employer's responsibilities.

(d) Preemption. No unit of local government, including a home rule unit, may require any employer to use an Employment Eligibility Verification System, including under the following circumstances:

(1) as a condition of receiving a government contract;

(2) as a condition of receiving a business license; or

(3) as penalty for violating licensing or other similar laws.

This subsection (d) is a denial and limitation of home rule powers and functions under subsection (h) of Section 6 of Article VII of the Illinois Constitution.

CREDIT(S)

P.A. 87-807, § 12, added by P.A. 95-138, § 5, eff. Jan. 1, 2008.

820 I.L.C.S. 55/12, IL ST CH 820 § 55/12

Current through P.A. 95-698 of the 2007 Reg. Sess.

© 2007 Thomson/West

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.